UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:17-CV-00085-TBR

TORI T. CURTIS,                                                  PLAINTIFF

v.

DIONNE HARDIN, *et. al.*,                                    DEFENDANTS

**MEMORANDUM OPINION**

Plaintiff Tori T. Curtis, proceeding *pro se* and *in forma pauperis*, brings this 42 U.S.C. § 1983 action against Defendants Randy White, Jill Robertson (misidentified in Plaintiff's complaint as "Jill Roberts"), Troy Belt, Skyla Grief (misidentified in Plaintiff's complaint as "Skylar Grief"), and Benjamin Mitchell (misidentified in Plaintiff's complaint as "Michael Mitchell") alleging failure to protect in violation of the Eighth Amendment to the United States Constitution.[1] [DN 1; DN 9; DN 10.] Defendants moved for summary judgment on this claim in February 2018, [DN 21], and Curtis never responded. For the reasons discussed in detail below, Defendants' motion is **GRANTED**. A separate Order and Judgment shall issue contemporaneous with this Memorandum Opinion.

BACKGROUND

Curtis alleges that, on December 4, 2016, another inmate, Johnathan Towery, raped him in the bathroom at Kentucky State Penitentiary (KSP), where they were both inmates. [DN 1 at 9 (Complaint).] According to Curtis, Towery and other inmates threatened to injure Curtis if he did not comply with Towery's demands for sex. [*Id.* at 9–10.] Later that day, Curtis reported what happened to KSP officials, who began a Prison Rape Elimination Act ("PREA") investigation.

---

[1] These are the only claims and Defendants that were allowed to proceed passed 28 U.S.C. § 1915A review. Curtis misidentified certain Defendants in his complaint, but the Court will use their correct names herein. Where necessary, the Court will use brackets to substitute the correct names when quoting from Curtis's complaint.

1

[*Id.* at 12.] Curtis was taken to the Internal Affairs office, where KSP employee and a police officer interviewed him. [*Id.*] They also reviewed with Curtis the video footage that showed Curtis entering the restroom earlier that day and then Towery entering shortly after. [*Id.*] Next, Curtis was taken to a hospital where a rape kit was administered. [*Id.*] Upon his return, he was placed in protective custody segregation. [*Id.*] For the remainder of the investigation, both inmates were kept in administrative segregation. [DN 21-11 at 2 (Amanda Scott Affidavit).]

A few days later, Curtis was interviewed by Lieutenant Derek Roberts and Sergeant Benjamin Mitchell regarding a letter KSP officials found in Towery's cell which, following handwriting comparisons, was found to have been written by Curtis. [*Id.*] This letter, attached as an exhibit to Defendants' motion for summary judgment, is addressed to "Big Daddy" and purports to offer the recipient "beautiful head" and "good pussy" in exchange for $10.00. [DN 21-5 (Letter).] Curtis next writes "I'd like the money either before or right after we finish, we can do our think either tomorrow or Sunday so hit me back?? It's a better price then I said then last time." [*Id.*] Curtis initially denied writing the letter at all, [DN 21-4 at 5], but later stated that he wrote this letter not to Towery, but to Towery's neighbor "as a joke for recreation for laughs." [DN 1 at 12–13.] Curtis says that the only way he can think of that Towery could have gotten the letter is if the neighbor gave it to him. [*Id.* at 13.]

Defendants tell a different version of events, however. According to Defendants, when they interviewed Towery on December 6, "he admitted he had attempted to have sex with Curtis, but [stated that he] had been unable to do so. Towery stated that at no point during the attempt to have sex did Curtis tell him to stop." [DN 21-1 at 5.] After officials found the letter in Towery's cell while packing his belongings, they asked Towery if there was anything to corroborate his story. [*Id.*] Towery responded

> that Curtis had written him a letter about having sex. Sgt. Mitchell then showed Towery the letter that had been found in his cell. Towery stated that the letter was given to him by Curtis on Friday. Towery stated that he had given Curtis two bags of coffee and a bag of Jack-Mac on Saturday as payment for sex. Towery informed Sgt. Mitchell that on Sunday at about 9:00 A.M., Curtis approached him to see if they were still going to do it.

[*Id.* (internal citations omitted).] On December 7, "Lt. Roberts and Sgt. Mitchell began reviewing surveillance footage to see if they could corroborate Towery's story that Curtis had approached him about sex. Their review of the surveillance video revealed that on December 4, Curtis approached Towery in the weight room. Curtis got Towery off to the side and spoke with him just as Towery had stated." [*Id.* (internal citations omitted).]

Ultimately, Sgt. Mitchell found that there was no evidence to support Curtis's allegation of rape and that the encounter was consensual. [*Id.*] Curtis received disciplinary write-ups for inappropriate sexual behavior and for offering sex in exchange for money. [*Id.* at 6.] On January 5, 2017, the Adjustment Committee found Curtis guilty of both inappropriate sexual behavior and prostitution. [*Id.*] Curtis did not appeal either decision. [DN 21-6 at 5; DN 21-7 at 5.]

On January 20, 2017, "Towery was transferred out of administrative segregation and back to general population." [*Id.*] Curtis was transferred back into the general population on February 3, 2017. [*Id.*] However, on March 11, 2017, Curtis was briefly placed in the Restrictive Housing Unit after he reported "fearing for his personal safety" because "Towery . . . and his buddies were giving him a hard time due to a PREA investigation involving himself and Inmate Towery." [DN 21-8 at 1 (Protective Custody Form).] However, when the officer "asked if they were extorting him or threatening to physically harm him he said the threats were non-specific." [*Id.*] Ultimately, the Classification Committee did "not recommend [protective custody] placement" because the "committee [wa]s unable to substantiate any of the inmate's claims." [*Id.* at 3.] Curtis did not appeal the decision. [*Id.* at 4.]

3

On May 31, 2017, Curtis filed his complaint in the instant lawsuit. [DN 1.] Therein, he alleges that Defendants Randy White, Jill Robertson, Troy Belt, Skyla Grief, and Benjamin Mitchell[2] violated his rights under the Eighth Amendment by failing to protect him from a substantial risk of harm. [*Id.* at 15–17.] Specifically, Curtis alleges that Defendants led Curtis to believe they had put in a request for him to be transferred to a different prison, but that this was untrue. [*Id.* at 15.] Next, Curtis alleges that Defendants falsely told him that the "inmate was transferred who [Curtis] did have some problems with," so that it was safe for Curtis to be released back into the general prison population. [*Id.*] Curtis says that, though he signed a "conflict resolution" form affirming that he did not have any problems with any inmates in the yard, he only did this under the belief that Towery had been transferred. [*Id.* at 16.] However, Curtis alleges that this was untrue, and that he was released back into the general population along with Towery. [*Id.*]

Curtis states in his complaint that he was "scared to death going back out to general population around Towery and his friends plus [with] everyone else knowing [he] came to correctional officers for help." [*Id.*] According to Curtis, shortly after he was released, Towery told Curtis that he needed to pay him in canteen items once a week and that if he could not, "he was going to beat [Curtis's] face off." [*Id.*] In sum, Curtis alleges that all five Defendants put his life and safety in jeopardy by releasing him into the general population along with Towery, and that this violated his Eighth Amendment rights. All Defendants have moved for summary judgment.

---

[2] Curtis names several more Defendants in his complaint, [*see* DN 1], but as the Court explained above, only Curtis's Eighth Amendment claim against these five Defendants survived 28 U.S.C. § 1915A review.

4

STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

The moving party must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of the nonmovant's claim or defense. Fed. R. Civ. P. 56(c); *see also Laster*, 746 F.3d at 726 (citing *Celotex*, 477 U.S. at 324). Assuming the moving party satisfies its burden of production, the nonmovant "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Laster*, 746 F.3d at 726 (citing *Celotex*, 477 U.S. at 324). "[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is "whether the party bearing the burden of proof has presented a jury question as to each element in the case." *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). Nor will mere speculation suffice to defeat a motion for summary judgment: "[t]he

5

mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

DISCUSSION

Defendants move for summary judgment on two grounds. First, they argue that summary judgment is appropriate because Curtis failed to exhaust his administrative remedies regarding his transfer back into the general prison population. [DN 21-1 at 8–10.] Second, they argue that, even if Curtis had exhausted his administrative remedies, he has failed to raise a genuine dispute of fact for trial regarding his Eighth Amendment failure to protect claim. [*Id.* at 10–16.] As the Court will explain fully below, Defendants are correct in both regards.

A. **Exhaustion of Administrative Remedies**

The Prison Litigation Reform Act of 1995 ("PLRA") requires a prisoner to exhaust all available administrative remedies before filing any action "with respect to prison conditions" under 42 U.S.C. § 1983 or any other federal law. 42 U.S.C. § 1997e(a). That exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *accord Freeman v. Francis*, 196 F.3d 641, 644 (6th Cir. 1999). Exhaustion is mandatory and the remedies provided "need not meet federal standards, nor must they be 'plain, speedy, or effective.' " *Porter*, 534 U.S. at 524 (quoting *Booth v. Churner*, 532 U.S. 731, 739 (2001)). "Proper exhaustion demands compliance with [the prison's] deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). Failure to exhaust administrative remedies is an affirmative defense, which the defendant

has the burden to plead and prove by a preponderance of the evidence. *Lee v. Willey*, 789 F.3d 673, 677 (6th Cir. 2015) (citing *Jones v. Bock*, 549 U.S. 199, 216 (2007)).

Here, Defendants cite to portions of the Kentucky Corrections Policies and Procedures ("CPPs"), which contain the procedure for an inmate to appeal any classification action.[3] The term "classification action" refers, in part, to assigning inmates a custody level and institutional placement within the prison. [DN 21-9 at 3 (CPP 18.1).] This includes decisions such as whether to place an inmate in protective custody, whether to transfer an inmate to another institution, or whether to transfer an inmate within a single institution. [*See* DN 21-10 at 1 (Scott Affidavit).] CPP 18.1 provides the following procedure for appealing a classification action:

> M.     Appeals
>
> 1.     An inmate may appeal any classification action to the Warden or his designee within five (5) working days of the action. The Warden or his designee shall respond in writing to an appeal of a classification action within fifteen (15) working days of receipt of the appeal.
>
>        \*\*\*
>
> 2.     If the inmate is not satisfied with the response received from the Warden or his designee, the inmate may request in writing to the Director of Population Management or designee that his case be reviewed. This request shall be submitted within five (5) working days of receipt of the Warden's response. The Director of Population Management shall respond in writing within fifteen (15) working days of receipt of the request for review.
>
>        \*\*\*

[*Id.* at 9.] According to Defendants, "Curtis'[s] transfer to general population on February 3, 2017 was a classification decision," but Curtis failed to file an appeal to the Warden or request a review of the action from the Director of Population Management. [DN 21-1 at 8–9; DN 21-10 at

---

[3] As Corrections Program Administrator Amanda Scott explains in her affidavit, transfers and classifications of inmates are non-grievable under the familiar Inmate Grievance Procedure set out in CPP 14.6. Rather, an inmate who wishes to appeal classification decisions must do so under the appeal procedure set out in CPP 18.1, Classification of the Inmate. [DN 21-10 at 1–2 (Scott Affidavit).]

2 (Scott Affidavit).] Curtis also did not appeal the Classification Committee's March 15, 2017 decision to deny him protective custody. [DN 21-8 at 4 (Defendant White noting that "Inmate Curtis has not substantiated a factual or credible need for pc placement" and further that "No appeal was received from the inmate for consideration.").] Curtis did not file a response to Defendants' motion for summary judgment, nor did he allege in his complaint that he filed an appeal of these classification actions or otherwise exhausted his administrative remedies. Accordingly, it is undisputed that Curtis did not do so.

Curtis's sole allegation in this action is that Defendants violated his constitutional rights by initially leading him to believe that either he or Towery would be transferred but instead released Curtis back into the general prison population with Towery, putting Curtis at risk for serious harm. [*See* DN 1 at 15–16.] However, "[n]o action shall be brought with respect to prison conditions . . . by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Here, Curtis had available administrative remedies— appealing to the Warden and then requesting a review of the Warden's decision by the Director of Population Management—which he failed to exhaust. Accordingly, Defendants are entitled to summary judgment on this ground.

### B. Eighth Amendment Failure to Protect

Even if Curtis had exhausted his administrative remedies, however, Defendants are nonetheless entitled to summary judgment on the merits of Curtis's Eighth Amendment failure to protect claim.

"The Eighth Amendment prohibits the imposition of 'cruel and unusual punishments' upon prisoners." *Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014) (quoting U.S. Const. amend. VIII). To establish liability under the Eighth Amendment for a claim based on a failure to

protect, the type of claim Curtis brings in this action, Curtis must show that the prison officials he sues "acted with 'deliberate indifference' to a substantial risk" of serious harm befalling him. *Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001). The concept of "deliberate indifference" encompasses both an objective and a subjective component.

To satisfy the objective component, an "inmate must show that 'he is incarcerated under conditions posing a substantial risk of serious harm.' " *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011) (quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)). The objective component must be analyzed in "the abstract." *Clark-Murphy v. Foreback*, 439 F.3d 280, 286–87 (6th Cir. 2006). The subjective component requires an inmate to "show that (1) 'the official being sued subjectively perceived facts from which to infer a substantial risk to the prisoner,' (2) the official 'did in fact draw the inference,' and (3) the official 'then disregarded that risk.' " *Richko v. Wayne Cty.*, 819 F.3d 907, 916 (6th Cir. 2016) (quoting *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014)). An official's state of mind must be "more blameworthy than negligence" before liability will attach. *Woods v. Lecureux*, 110 F.3d 1215, 1222 (6th Cir. 1997) (quoting *Farmer*, 511 U.S. at 835).

According to Curtis, after he was released back into the general prison population following his alleged rape by Towery, Towery threatened him and told him that if he did not pay him in canteen items every week, "he was going to beat [Curtis's] face off." [DN 1 at 16.] Additionally, Curtis alleges that the very fact that he was released back into the yard with Towery after the alleged rape demonstrates that Defendants "don't care about anyone's safety" and that they put his "life and safety in jeopardy." [*Id.*] Even assuming for the sake of argument that these allegations are sufficient to clear the first hurdle of adducing sufficient evidence to show "that 'he [was] incarcerated under conditions posing a substantial risk of serious harm,' "

9

*Bishop*, 636 F.3d at 766 (quoting *Farmer*, 511 U.S. at 833), however, Curtis cannot clear the second hurdle.

The subjective component generally must be "addressed for each officer individually," *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005). However, here, the only allegations Curtis makes in his complaint are against Defendants as a whole. For instance, Curtis explains that Defendants "all did the same exact things to" him and therefore he does not make specific, differing allegations with regard to any one Defendant. [DN 1 at 15–16.] Rather, every allegation Curtis makes begins with "[e]ach defendant" or "each of them." [*Id.* at 15.] Accordingly, the only evidence the Court has to differentiate between Defendants is the statements each Defendant makes in their affidavits that are attached to Defendants' motion for summary judgment.

Each Defendants' affidavit demonstrates that they did not "*subjectively* perceive[ ] facts from which to infer a substantial risk to" Curtis. *Richko*, 819 F.3d at 916 (quoting *Rouster*, 749 F.3d at 446) (emphasis added). First, Skyla Grief states in her affidavit that, though she "recall[s] Curtis'[s] allegation that he was sexual[ly] assaulted by Inmate Johnathan Towery," the PREA "investigation revealed that the sexual encounter between Curtis and Towery had been consensual." [DN 21-11 at 1–2 (Grief Affidavit).] Accordingly, Grief states that "it was not necessary to transfer either of them out of KSP as a means to keep them separated." [*Id.* at 2.] Grief further emphasizes, however, that when Curtis initially made his allegation of rape, both Curtis and Towery were separated and put into administrative segregation during the investigation, which is standard practice when an inmate alleges they have been sexually assaulted. [*Id.* at 1–2.] Once the investigation led to Curtis's letter, however, which appeared to offer Towery sex in exchange for money, KSP officials determined that Curtis consented to the

sexual encounter with Towery. [*See id.*] Only then were Curtis and Towery released back into general prison population. [*Id.*]

Though Curtis initially denied writing the letter at all, [DN 21-4 at 5], Curtis now alleges that this letter was a joke and that he sent it not to Towery, but to Towery's neighbor. [DN 1 at 12–13.] But even viewing the record in the light most favorable to Curtis, there is still no evidence to create a jury issue as to whether Grief actually subjectively perceived that Curtis was at a risk for harm. Rather, Grief clearly *believed* that the encounter was consensual and that therefore that "documentation of a conflict" or "transfer of either of them" was unnecessary. [DN 21-11 at 2.] Whether or not this belief was erroneous is irrelevant. Rather, the crucial inquiry is whether Grief subjectively perceived facts that led her to *actually infer* a substantial risk of harm to Curtis. *See Richko*, 819 F.3d at 916 (quoting *Rouster*, 749 F.3d at 446). Grief states that, "[i]f the PREA investigation had revealed that Towery had sexually assaulted Curtis, [she] would have documented a conflict between them" to ensure that they would be "housed in a manner that w[ould] keep them isolated from each other." [DN 21-11 at 2.] Accordingly, there is no evidence to suggest that Grief actually inferred that Curtis was at a substantial risk of harm and that she disregarded that risk.

Second, Defendant Randy White, the Warden, states in his affidavit that he received the results of the PREA investigation from Defendant Mitchell which "revealed that the sexual encounter had been consensual and that Curtis had prostituted himself to Towery." [DN 21-12 at 1–2 (White Affidavit).] However, White further states that "[i]f the PREA investigation had revealed that Towery had sexually assaulted Curtis, a conflict would have been documented in both inmates KDOC records to ensure they were kept isolated from each other. But since the sexual encounter was found to be consensual, documentation of conflict was not warranted." [*Id.*

at 2.] This demonstrates that, even if Curtis *was* assaulted by Towery, Defendant White did not *believe* this was the case. In other words, he did not subjectively perceive facts that led him to infer a substantial risk of harm to Curtis which he then disregarded.

Third, Defendant Jill Robertson states that she "never had any conversation with Inmate Curtis about Inmate Johnathan Towery . . . being transferred out of KSP" and that she "certainly never misled Inmate Curtis into believing that Inmate Towery had been transferred out of KSP prior to Inmate Curtis'[s] transfer out of segregation and back to general population on February 3, 2017." [DN 21-13 (Robertson Affidavit).] Curtis makes no additional allegations specifically directed toward Robertson in his complaint. Once again, therefore, there is no evidence that Defendant Robertson actually, subjectively perceived facts which led her to infer a substantial risk of harm to Curtis which she disregarded.

Fourth, Defendant Benjamin Mitchell also avers that he never had any conversation with Curtis about him or Towery being transferred. [DN 21-14 at 1 (Mitchell Affidavit).] According to Mitchell, the only interaction he ever had with Curtis was interviewing him "in connection with his request for protective custody in March of 2017." [*Id.* at 2.] Mitchell reported that during that interview, Curtis only stated that "he was having a hard time living in general population because Inmate Towery and his friends were giving him a hard time about the PREA investigation." [*Id.*] However, when Mitchell asked Curtis "if they were extorting him or threatening him with physical harm, Inmate Curtis told [Mitchell] that the threats were non-specific." [*Id.*] Accordingly, Curtis's request for protective custody was denied, and Curtis did not appeal that decision. [*See* DN 21-8 at 4.] Curtis does not mention the March 2017 interview in his complaint, [*see* DN 1], nor did he file a response disputing Defendant Mitchell's characterization of Curtis's statements during that interview. Without more, the record does not

12

reflect that Defendant Mitchell subjectively perceived facts which led him to infer a substantial risk of harm to Curtis which he then disregarded. Rather, the record reflects that Mitchell attempted to learn more about Curtis's fears of being in the prison yard, but that Curtis did not elaborate.

Finally, Defendant Troy Belt states that he "never had any conversation with Inmate Curtis about Inmate Johnathan Towery . . . being transferred out of KSP" and that he "certainly never misled Inmate Curtis into believing that Inmate Towery had been transferred out of KSP prior to Inmate Curtis'[s] transfer out of segregation and back to general population on February 3, 2017." [DN 21-15 at 1 (Belt Affidavit).] Curtis alleges nothing specific that might show Defendant Belt acted, or failed to act, with deliberate indifference. Without any evidence to suggest that Defendant Belt knew of facts which led him to infer a substantial risk of harm to Curtis which he then deliberately disregarded, Curtis has also failed to raise a jury question as to his Eighth Amendment claim against Defendant Belt.

"[A] prison official who was unaware of a substantial risk of harm to an inmate may not be held liable under the Eighth Amendment even if the risk was obvious and a reasonable prison official would have noticed it." *Bishop*, 636 F.3d at 767. Here, it is clear that KSP officials, including all five Defendants in this action, believed that the sexual encounter between Curtis and Towery was consensual and therefore that allowing the two inmates back into the general prison population together did not pose a substantial risk of harm to Curtis. Though Curtis contends that the encounter was nonconsensual and that the letter he wrote was a joke, there is no evidence that this allegation led any Defendant to *subjectively perceive* a substantial risk of harm to Curtis. Rather, Defendants all believed that no conflict existed between Curtis and Towery. In sum, even viewing the record in the light most favorable to Curtis, there is no evidence which

could lead a reasonable factfinder to conclude that any of the Defendants deliberately disregarded a substantial risk of harm to Curtis. Accordingly, summary judgment is warranted in favor of each Defendant on the merits of Curtis's Eighth Amendment failure to protect claim.

CONCLUSION

For the reasons discussed in detail above, Defendants' motion for summary judgment, [DN 21], is **GRANTED**, and all claims in the above-captioned action are dismissed with prejudice. A separate Order and Judgment shall issue.

Date: May 30, 2018

cc: Counsel

*Pro se* Plaintiff Tori T. Curtis
226115
EASTERN KENTUCKY CORRECTIONAL COMPLEX
RHU-Dorm 5-CL-14
200 Road to Justice
West Liberty, KY 41472

**Thomas B. Russell, Senior Judge**
**United States District Court**